**joanne**

| | |
|---|---|
| **From:** | NYCSMACNA [mail@nycsmacna.org] |
| **Sent:** | Tuesday, December 20, 2011 12:31 PM |
| **To:** | joanne |
| **Subject:** | Contract |

# AGREEMENT
# SHEET METAL CONTRACTING DIVISION
# OF THE
# CONSTRUCTION INDUSTRY
# BETWEEN
# SHEET METAL WORKERS'
# INTERNATIONAL ASSOCIATION
# LOCAL UNION NO.28



# AND
# SHEET METAL & AIR CONDITIONING
# CONTRACTORS ASSOCIATION
# OF NEW YORK CITY, INC.
# AND
# SMACNA OF LONG ISLAND, INC.
# AND THOSE EMPLOYERS
# WHO SUBSCRIBE THERETO

## EFFECTIVE   SEPTEMBER 15, 2011
## TERMINATES JULY 31, 2014

# TABLE OF CONTENTS

*Article*                                                                 **Page**

I.      Jurisdiction .................................................................2

II.     Fan Maintenance ........................................................7

III.    Work Preservation & No-Subcontracting .....................9

        Work Performed City of New York ...........................10

        Work Performed Nassau/Suffolk Counties ..............18

IV.     Union Security .........................................................22

V.      Manpower ................................................................23

VI.     Apprentices .............................................................24

VII.    Wages ......................................................................27

VIII.   Hours & Holidays ....................................................30

IX.     Shift Work ...............................................................32

X.      Shop Steward ..........................................................33

XL      Travel ......................................................................34

XII.    Fringe Benefit Funds ..............................................35

XIII.   Promotion Funds .....................................................42

XIV.    Work Rules ..............................................................44

XV.     Miscellaneous .........................................................50

XVI.    Grievance Procedure ...............................................52

XVII.   Term ........................................................................54

        Sketch A ..................................................................55

        Sketch B ..................................................................56

        Sketch C ..................................................................57

        Joint Negotiating Committee ...................................58

<div align="center">

**AGREEMENT**
**SHEET METAL CONTRACTING DIVISION**
**OF THE**
**CONSTRUCTION INDUSTRY**

</div>

<div align="center">

**THIS AGREEMENT, effective as of the . fifteenth day of September 2011, by and between
SHEET METAL & AIR CONDITIONING CONTRACTORS ASSOCIATION OF NEW YORK
CITY, INC., and SMACNA OF LONG ISLAND, INC., hereinafter referred to as the "Employer"
and SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, LOCAL UNIONNO. 28,
hereinafter referred to as the "Union."**

</div>

<div align="center">

## ARTICLE I
## **JURISDICTION**

</div>

## SECTION 1.

A.    This Agreement covers the rate of pay rules and working conditions of all employees of the Employer including owner/members as defined in the Sheet Metal Workers' International Association Constitution and Ritual, engaged in the manufacture, fabrication, assembly, erection, installation, dismantling, reconditioning, adjustment, alteration, repairing and servicing of all sheet metal work (including ferrous or nonferrous sheet metal) or any and all substitute materials used in lieu thereof (any questions of jurisdiction of substitute material on job sites within the City of New York to be settled in accordance with the Joint Arbitration Plan between the Building Trades Employers' Association and the Unions of the Building Trades of the City of New York), including all shop and field sketches used in the fabrication and erection (including those taken from original architectural and engineering drawings or sketches) and all other work included in the jurisdiction of Sheet Metal Workers' International Association.

B.    Within the limits of Nassau/Suffolk Counties, New York, disputes which arise concerning the substitution of material to be settled and adjusted according to the present plan established by the Building and Construction Trades Department (Plan for National Joint Board for the Settlement of Jurisdictional Disputes in the Building and Construction Industry) or any other plan or method or procedure that may be adopted as a replacement thereof.

C.    Testing and balancing of all air-handling equipment ductwork and water-balancing shall be performed only by journeyperson sheet metal workers in the bargaining unit covered by this Agreement. Testing

and Balancing Employers must bid a job to do the complete testing and balancing work, which includes using computer communication. The Testing and Balancing Employer, using journeyperson sheet metal workers, shall balance a system by testing and adjusting parameters for the proper C.F.M. square foot area, velocity pressure, and K factor.

D.    All internal linings for casings, plenums and ducts are and shall remain the work of sheet metal workers, exclusively, which shall be performed only by journeyperson and apprentice

sheet metal workers in the bargaining unit covered by this Agreement. Internal linings for casings, plenums and ducts must be lined prior to erection.

E.    Supply casings shall be the work of and performed only by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement in accordance with Sketch "A" on page 55.

F, Supply air shafts shall be sheet metal and the work of and be performed only by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement.

G.    Walls, floors and ceilings (excluding concrete and masonry and excluding penthouses) that are part of the HVAC system shall be sheet metal and the work of and be performed only by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement, unless they serve a dual purpose.

H.    O.B.D.'s and Santrols shall be utilized as per Sketches B and C on pages 56 and 57.

The handling and installation of electric motors for fans. VAV boxes, dampers, etc. in work contracted for the renovation and/or rehabilitation of the HVAC System shall be done by Local Union No. 28 members under the terms of this Agreement.

J.    The fabrication, handling and installing of all types of solar panels shall be done by Local Union No. 28 members under the terms of this Agreement.

K.    The work connected with the following items shall be performed only by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement:
   (i).       Under Floor Air Distribution Systems.
   (ii).      Indoor Air Quality.
   (iii).     Energy Management.
   (iv).      Photovoltaic Cells and Support Frames and Modules.
   (v).       Solar-to-Air Systems.

(vi). Sub-slab Depressurization Systems.

(vii). Sock Systems.

(viii). FRP Duct.

(ix). Toilet Partitions regardless of material.

SECTION 2. As used in Section 1. A, the term "dismantling" shall consist of all of the following work:
   A.   When duct work or other sheet metal work is the only work to be dismantled; and
   B.   When duct work or other sheet metal work is dismantled mechanically; and
   C.   When other trades dismantle the work of their respective trades.

SECTION 3. It is hereby understood and agreed that none but journeyperson sheet metal workers and registered apprentices shall be employed by the Employer within the bargaining unit on work specified in this Article of the Agreement quoted below, which work may not be specifically covered in the jurisdictional claims of the Sheet Metal Workers' International Association as provided for in this Article of the current Standard Form of Union Agreement. Work covered by this Agreement, the manufacturing and erection of all sheet metal in connection with buildings and structures, follows:

Hollow metal sash, frames, partitions, skylights, cornices, crestings, awnings, circular moldings, spandrels, (except stamping of same), sheet iron sheeting or roofing, package chutes, linen chutes, rubbish chutes, hoods, sheet metal fireproofing, ventilators, heating and ventilating pipes, air washers, conveyors, breeching and smoke pipes for hot water heaters, furnaces and boilers, laundry dryers and all connections to and from same, metal jackets and lagging for pumps and boilers, blow pipe work in mills, sheet metal connections to machines in planing mills, saw mills, and other factories (whether it be used for ventilating, heating or other purposes), sheet metal connections to and from fans, separators, sheet metal cyclones for shavings or other refuse in connection with various factories, sheet metal work in connection with or fastened to storefronts or windows, sheet metal work in connection with concrete construction and sheet metal columns and casings, covering all drain boards, lining of coil boxes, iceboxes, and other sheet metal work in connection with bar furniture and soda fountains. Spot welding, electric arc welding, oxyacetylene cutting, and welding in connection with sheet metal work covered by this Agreement; also sheet metal work in connection with

plain and corrugated fire doors; also the erection of floor domes, the setting of registers and register faces, the cutting and bending of metal necessary for the application and erection of metal ceilings and side walls (except stamping), the applying of metal ceiling and side walls and the furring and sheathing of same. The

assembling and erection of fans and blowers; also the erection of metal furniture, factory bins, shelving and lockers, corrugated iron on roofs and sidings, all metal shingles and metal slate and tile, plain or covered with a foreign substance, the manufacture and erection of corrugated wire glass and accessories; also the glazing of metal skylights. The installation of unit vents where there is sheet metal work in connection with the supply and discharge of air, the setting of radiator enclosures of sheet metal where it does not support the cleaning of ductwork in new and existing buildings. In the manufacture of drawn metal work the work of the journeyperson sheet metal workers shall be the cutting and forming of the metal before the same is applied to the wood, and all clipping and soldering that may be necessary in the finishing of the assembled parts and the covering of wood and composition doors, frames and sash with sheet metal. Also such other sheet metal work, not herein specified, that has been decided by the Executive Committee of the Building Trades Employers Association to be, or is now, in the possession of the Sheet Metal Workers' Union, shall be regarded as sheet metal workers' work.

In the Kitchen Equipment industry, it is understood that the term "sheet metal work" shall mean all work made of sheet metal including the making, mounting, erecting, cleaning and repairing of all steel and gas ranges, grid irons and oven racks, hoods, tables and stands, warming closets, plate warmers and plate shelves, bands, doors and slides for same, drip pans, urns and percolators, kettles, revolving covers, meat dishes and covers, steam and carving tables and drainers for same, bain marie boxes and potato mashers and any other items or types of work that are included in Article 1, Section 5 of the current Constitution and Ritual of the Sheet Metal Workers' International Association.

In the Testing and Balancing segment of the sheet metal industry, it is understood that the term "Testing and Balancing" shall mean all work in the Testing, Adjusting, and Balancing of BOTH AIR AND WATER systems. This work includes the set up and operations of any and all instruments, tools, equipment, and computers and any computer like device used in communicating to the equipment being tested, adjusted and balanced.

All such work as has been described in the foregoing paragraphs shall be performed by journeyperson sheet metal workers and apprentices who shall be furnished only to Employers regularly engaged in the sheet metal industry, except that authorization may be issued from time to time by united agreement of the Joint Adjustment Board, authorizing the employment of journeyperson sheet metal workers by an Employer on work that may be the subject of jurisdictional disputes in order to permit the claim or retention of such work by sheet metal workers.

**SECTION 4.** If a. contractor purchases or rents a knockdown shanty of any material, the jurisdiction for the erection of such shanty shall be that of Local Union No. 28.

**SECTION 5.** The Employer agrees that all the work described in this Article shall be performed only by journeyperson or apprentice sheet metal workers in the bargaining unit covered by this Agreement.

**SECTION 6.**
    A.    Within the limits of New York City, New York, disputes which arise between the Sheet Metal Trade and other trades and disputes relative to questions of jurisdiction of trade shall be adjusted in accordance with the method set forth in the Joint Arbitration Plan of the

New York Building Trades as adopted on July 9, 1903 and amended on April 22, 1905, and all decisions rendered thereunder determining disputes arising out of the conflicting jurisdictional claims of the various trades shall be recognized by and be binding upon the parties hereto.

Jurisdictional controversies within the limits of New York City, New York shall be settled in accordance with the provisions and intent of agreements between the Sheet Metal Workers' International Association and other National or International Unions directly involved or by decisions rendered by regularly constituted authorities recognized by the Sheet Metal Workers' International Association, including any jurisdictional council voluntarily set up by the AFL-CIO Building Trades Unions and various contractors' associations (including Sheet Metal and Air Conditioning Contractors' National Association, Inc.), to which the Sheet Metal Workers' International Association subscribes.

B.    Within the limits of Nassau/Suffolk Counties, New York, disputes which arise concerning the jurisdictional controversies to be settled and adjusted according to the present plan established by the Building and Construction Trades Department (Plan for National Joint Board for the Settlement of Jurisdictional Disputes in the Building and Construction Industry) or any other plan or method or procedure that may be adopted as a replacement thereof.

# ARTICLE II
## FAN MAINTENANCE

SECTION I. In the temporary operation of fans or blowers in a new building, or in an addition to an existing building for heating and/or ventilation, and/or air conditioning, prior to the completion of the duct work in connection therewith, journeyperson sheet metal workers shall have jurisdiction in the temporary operation and/or maintenance of such fans or blowers, and they shall work in full shifts of not less than seven (7) hours, nor more than eight (8) hours each, and shall be paid eighty percent (80%) of the then prevailing straight time hourly rate of pay for each shift of this work, including nights, Saturdays, Sundays, and holidays, on full shifts. No journeyperson engaged in fan maintenance shall work in excess of forty (40) hours in any work week. The eighty percent (80%) ratio to journeyperson wage rate is not to be applied to the fringe benefit contributions provided in this Collective Bargaining Agreement. The Employer will continue to pay fringe benefits at the full rate. The Employer shall receive a twenty percent (20%) reimbursement of all fan maintenance wages from the Joint Labor Management Committee and Trust.

A.    The jurisdiction of Local Union No. 28 shall apply to the operation and/or maintenance of fans or blowers only for new systems installed in an existing building or when an old system is in effect completely replaced by a more modern and complete system.

B.    Journeyperson sheet metal workers shall not be employed for the sole purpose of operating and/or maintaining fans or blowers during any period when such fans or blowers are operating for the sole purpose of testing or adjusting a heating, ventilating or air-conditioning system.

C.    The Employer is to provide a log for workers to sign in and sign out to verify hours worked as many owners or construction managers require copies of log or shop tickets to be attached with invoices for payment.

D.    The Employer shall provide manpower for three (3) shifts per twenty-four hour period. Hours worked per shift will be limited to one (1) eight-hour shift every twenty-four hours and forty (40) hours per payroll period. *The* number of different sheet metal workers assigned to fan maintenance on a particular job site shall be limited.

E.    Journeypersons working fan maintenance shall be expected to perform the following duties:

(i).    Check that all systems are running, as required.

(ii).    Check that all belts, pulleys, drive and belt guards are properly secured.

(iii).    Check that all access doors are secured.

(iv).    Check filters or replace filters, if required.

(v).     Check auto control dampers; confirm that they are operating properly.

(vi).     Check and lubricate fans and equipment, if required.

F. On fan powered boxes, there shall be no fan maintenance required on the first floor of their use, but fan maintenance shall be required when they are used on the second or any additional floor.

**SECTION** 2. All temporary operations and/or maintenance shall be paid at single time. Less than a full shift of work outside of regular hours shall be paid at one and one-half (1 1/2) time, except for Sundays and those recognized holidays listed in Article VIII, Section 4.

**SECTION 3.** In the temporary operation and/or maintenance of fans and blowers, the jurisdiction of Sheet Metal Workers' Local Union No. 28 shall continue:

A.     Until a system and/or systems are accepted by the owner or his representative after having been tested and balanced, and until the area is substantially completed.

B.     Each area in a building shall be considered as substantially completed for the purpose of stopping fan maintenance when all core work, toilets, elevator machine rooms, perimeter systems and fan rooms are installed in the area, and the public corridor and perimeter of the building are plastered to the ceiling height, or a substitute for plaster is used on either the public corridor or periphery or perimeter of a building. The plastering requirements shall be waived where the plastering is not done because the area is not rented.

**SECTION 4.** The number of journeyperson sheet metal workers required for each shift of fan maintenance shall be based on the assignment of one employee to maintain a reasonable number of operating heating, ventilating, air conditioning or exhaust systems.

# ARTICLE III
## WORK **PRESERVATION** AND
## NO **SUBCONTRACTING**

### SECTION I. RULES GOVERNING USE OF CONDUIT AND FLEXIBLE HOSE FOR SUPPLY AND/OR RETURN SYSTEMS AND FABRICATED ITEMS.

### INTRODUCTION

Historically, sheet metal workers are skilled journeypersons with four (4) years apprenticeship training and have always been unique in that they have fabricated what they erected. While other crafts in the building trades erected materials fabricated by others, sheet metal workers historically fabricated the cornices they erected, they fabricated the skylights they erected; and since the development of modem systems for air-conditioning, the have fabricated the ducts and distributional devices which they have erected. Lately the introduction of machine-made products for the conveying and distribution of air in air-conditioning systems has posed a serious threat to the nature and extent of job opportunities of sheet metal workers. Convinced that the introduction of these items, which are intended to reduce labor costs with resultant loss of job opportunities and to give no benefit of automation to sheet metal workers, and to reduce their trade to an erection trade only and to obviate the need for the use of their skills as fabricating craftspersons, sheet metal workers and their Union have insisted that reasonable rules be adopted for the conservation and spreading of work opportunities and terms of employment. Sheet metal workers and their Union insisted that the failure to adopt these reasonable rules would result in the loss of not less than seventy-five percent (75%) of the work hours now available to sheet metal workers.

To meet these demands for the preservation and extension of work opportunities and job conditions after an eight-week strike in 1960, a five-week strike in 1969, and a nine-week strike in 1972, and in consideration of the Union dropping many demands similarly designed to conserve work opportunities and to protect working conditions, the Employer has consented to the following Rules Governing Use of Spiral Conduit and Flexible Hose for Supply and/or Return Systems, which the Union deems necessary.

## RULES AND REGULATIONS FOR JOBS/WORK
## PERFORMED IN THE CITY OF NEW YORK, NEW YORK.

**SECTION** 1. (A) GENERAL

    1. The use of spiral conduit and flexible hose is divided into two (2) categories:

        A.      Airtight (high-pressure)

        B.      Conventional

    2. The classification of a system, for this purpose, will not be determined
by static pressure of velocity but by the following requirements:

        A.      A high-pressure system will have airtight duct work of special construction. It will be made airtight by mechanical means such as welding, gasketing, and/or caulking.

        B.      In addition, for a system to be considered high pressure, it must have pressure reduction devices such as one of the following:

            (i).      Pressure reducing valve with lined duct.

            (ii).     Pressure reducing valve with sound trap.

            (iii).    Attenuation box with pressure reducing valve.

            (iv).    Double duct or mixing box with valves.

            (v).     Peripheral high velocity system.

For the purposes of this section, VAV Boxes, Control Volume Boxes, and Fan Volume Boxes shall not be considered pressure-reducing devices.

    3. Any supply system that does not have both airtight construction and a pressure-reduction device will be considered a conventional system.

    4. The requirements in Paragraph No. 2 above refer to both supply and return systems, except, in addition to the aforementioned, a high velocity return system must have metal flues or metal risers to be considered high pressure, and be of airtight construction to qualify.

    5. There shall be no limitation in the use of spiral conduit and flexible hose in private one (1) and two (2) family homes and garden apartments up to three (3) stories.

    6. There shall be no limitation in the use of spiral conduit on exhaust and return risers in apartment houses except for kitchen exhaust risers.

    7. It shall be permissible to use spiral in airtight (high pressure) systems from the trunk to the box (variable air volume, control volume, fan volume) not to exceed ten feet (10').

8.On fume exhaust systems, dust collector systems, and carbon monoxide systems, each piece may be no longer than ten feet (10'). All fittings required shall be fabricated in the shop of the Employer.

## SECTION 1. **(B) CONVENTIONAL SYSTEMS.**

1.  The use of spiral conduit and flexible hose is not permitted in a conventional system, with the exception of when spiral conduit is used to a single outlet as a sub-branch off the main rectangular duct on low pressure systems.

2.  The use of flexible hose is not permitted on a conventional system, except as follows.

   A.    The device is supported by the ceiling grid;

   B.    The device snaps into or nests in the ceiling grid;

The device can only be installed from above the ceiling. Then connection to the diffuser may be made by using up to ten feet (10') of flexible hose, without restrictions.

### CONVENTIONAL SYSTEM          SKETCH No. 1



MAX 10' 0" FLEX

### SECTION 1. (C) **HIGH PRESSURE** (AIRTIGHT) **SYSTEMS** 1. Peripheral Systems (Single or Double Duct)

   A.    The use of spiral conduit shall not be restricted in any manner except that the maximum diameter of conduit shall be twenty inches (20").

   B.    Flexible hose may be used to connect the riser or crossover mains to the window units. There shall be no limitations of length or size in this application.

*(See Sketch No 3.)*

**NOTE:** Where the connection to the window unit is from a header duct, the header duct shall be adjacent to the periphery of the building. This applies to Sketch No. 3.

**DELETE SKETCH**



**MAX 10'0"**

**HIGH PRESSURE**

IF, X IⁿˢF- L, ḷ]u₊f
RETAN UC        OR
**DOUBLE DUCT
PERIPHERY
SYSTEM**
SKETCH No. 3

**2. Interior Single Duct Systems**

    A.

Unlimited use of spiral conduit up to a



maximum diameter of twenty inches (20") will be permitted from fan to connection at final pressure-reducing device.

B.

SKETCH NOT IN FULL TEXT – SEE ADDITIONL DRAWING RE:

3.      Rules Governing Use of Flexible Hose on
All-Air Outlets and Troffers on Sealed and Unsealed Systems (drawing below).



.MAX 10' 0" FLEX

A. Flexible hose may be used only to connect the inlet side of any box, *valve or* troffer.

B. The maximum length of flexible hose which can be used is ten feet (10').

C. Where flexible hose is permitted, there shall be no restriction as to its configuration.

## SECTION 2. MEMORANDUM CONTAINING NO SUBCONTRACTING CLAUSE

A. For the preservation of the work opportunities of journeyperson sheet metal workers and apprentice sheet metal workers within the collective bargaining unit, each Employer within the collective bargaining unit shall not subcontract out any item or items of work described herein below except that each said Employer shall have the right to subcontract for the manufacture, fabrication or installation of such work with any other Employer within the collective bargaining unit:

1. Duct work.

2. Radiator enclosures except when manufactured and sold as a unit including heating element.

3. Functional louvers.

4. Attenuation boxes except for mechanical devices contained herein; soundtraps.
5. Dampers: All types of dampers, including automatic dampers and multizone dampers, manual control dampers and fire control dampers, except patented pressure-reducing devices, OBD's and Santrols as per Sketches B and C, pages 56 & 57.
6. Skylights, sheet metal sleeves, pressure-reducing boxes, volume control boxes, troffers (plenums), high pressure fittings and gutters (excluding 112 round gutters).
7. Air-handling units in excess of 50,000 C.F.M.'s. Air-handling units up to a maximum of one hundred thousand (100,000) C.F.M.'s shall be permitted on Airside projects and for rooftop units distributing air in a building up to six (6) stories for all areas other than the borough of Manhattan. Rooftop units in excess of 100,000 C.F.M.'s must receive Union approval pending consideration of the work opportunities available on these units.
8. Testing and balancing both air and water systems.
9. All other work historically, traditionally and customarily performed by journeyperson sheet metal workers and apprentice sheet metal workers within the collective bargaining unit in accordance with the Collective Bargaining Agreement.

   All the work described in this "no subcontracting clause" shall be performed by journeyperson and/or apprentice sheet metal workers in the bargaining unit covered by this Agreement.

**B.** The Employer shall be required to perform all sheet metal work in its contract with its own employees. The Employer shall have the right to subcontract work within the bargaining unit under the following circumstances:

1. When it is an item the Employer does not normally fabricate.
2. When required, the Employer may purchase items from a manufacturing company whose employees are within the collective bargaining unit covered by this Agreement.
3. The Employer may subcontract a portion of a larger job if said subcontract includes drafting, fabrication and installation.
4. When the Employer takes sheet metal work as part of an HVAC contract as a mechanical contractor.

Each item described in the "No-Subcontracting Clause" shall have both an international label and a label indicating that it was

manufactured by employees within the collective bargaining unit covered by this Agreement.

## SECTION 3. SUBSTITUTE MATERIALS
### AND SUBSTITUTE SYSTEMS
The heating, ventilating and air conditioning industry is continuously introducing new methods for distributing air into the conditioned spaces. Two of these new systems known as the continuously slotted or linear type of distribution and the pressurized ceiling type of air distribution have seriously affected work opportunities for sheet metal workers and could cause a serious loss of employment opportunities.

## A. PRESSURIZED CEILING DISTRIBUTION/PRESSURED PLENUM DISTRIBUTION

This type of system consists of supply and return ducts delivering or returning conditioned air to or from the pressure chambers above a hung ceiling or under a raised floor of a room to which air is delivered. This air is distributed from the air chamber through various types of openings such as, but not limited to, perforated tile, slotted tile, slotted ceiling bars, floor tiles, etc. The installation of the ceiling or floor distributing panels and/or slotted diffusers and zone baffles, which replace the normal distribution and outlets, are substitutes for the ducts which normally and conventionally would carry the air.

Therefore, the distribution system when accompanied by a pressurized air chamber is within the jurisdiction of Local Union No. 28 and should be assigned to and installed by journeyperson and apprentice sheet metal workers in order to offset some of the opportunities for employment lost in the non-fabrication and non-erection of conventional systems because of the use of the aforesaid pressurized plenums.

In order to avoid jurisdictional disputes and "split" responsibility for this type of system for integrated performance, the Employers agree that this type of system should be included with the entire job under the HVAC section of the specifications and/or contract.

## RULES AND REGULATIONS FOR JOBS/WORK PERFORMED IN THE COUNTIES OF NASSAU/SUFFOLK, NEW YORK

## SECTION 1. (A) GENERAL

1. The use of spiral conduit and flexible hose is divided into two categories:
   - A.   Conventional
   - B.   Airtight (high velocity) i.e.: two thousand (2,000) F.P.M.
2. The classification of a system, for this purpose, will not be determined by the static pressure or velocity, but by the following requirements:
   - A.   A high pressure system will have airtight duct work of special construction. It will be made airtight by mechanical means such as welding, gasketing and/or caulking.
   - B.   In addition, for a system to be considered high velocity, it must have pressure reduction devices such as one of the following:
     - (i).   Pressure reducing valve with lined duct.
     - (ii).   Pressure reducing valve with sound trap.
     - (iii).   Attenuation box with pressure reducing valve.
     - (iv).   Double duct or mixing box with valves. (v.) Peripheral high velocity system.
     - (vi).   It shall be permissible to use spiral in airtight (high-pressure) systems from the trunk to the box (variable air volume, control volume, fan volume) not to exceed five feet (5'). ten feet (10').

For the purposes of this Section VAV Boxes, Control Volume Boxes, and Fan Volume Boxes shall not be considered pressure-reducing devices.

# SECTION I. **(B) CONVENTIONAL SYSTEMS**

1. *The use of spiral* pipe *is not* permitted in a conventional system, except as follows:

A.    Spiral duct may be used in place of transite or sonair duct in underground installation.

B.    Unlimited use of spiral pipe on branch lines and/or take off in private homes (one (1) and two (2) family) and garden type apartments.

C.    Where the original design specifications and mechanical drawings clearly indicate the use of conduit or spiral pipe.

D.    When spiral conduit is used to a single outlet as a sub-branch off the main rectangular duct on low pressure systems.

2. The use of flexible hose is permitted on a conventional system, as follows:

A.    Up to. ten feet (10') of flexible hose may be used without restrictions.

B.    Unlimited use of flexible hose in branch line and/or take off (one (1) and two (2) family homes) and garden type apartments.

C.    Ten feet (10') of flexible hose unless a greater length is otherwise specified may be used in the following special exhaust systems:

Fume exhaust system, Dust collector system,
Carbon monoxide system.

**SECTION** 1. (C) **HIGH PRESSURE** (Airtight) **SYSTEMS** 1. Peripheral Systems (Single or Double Duct)

A.    The use of spiral pipe shall not be restricted in any manner.

B.    Flexible hose may be used to connect the riser or crossover mains to the window units. There shall be no limitations of length or size in these applications.

FAN          MAX 10' 0" FLEX

2. Interior Single Duct System
   A.     The unlimited use of spiral pipe will be permitted from fan to connection at final
          pressure reducing device.

   B.     The use of flexible hose is permitted  to connect to any device which is supported by
          the ceiling up to a maximum of ten feet (10').



HIGH VELOCITY SYSTEMS

### ꜰᴀɴ3. **Double Duct Interior Systems**

A.    The use of spiral pipe from the fan to the pressure reducing or mixing box shall not be restricted in any manner.

B.    There shall be no spiral pipe permitted on the conventional (low pressure) side of the pressure reducing device or mixing box, except when spiral conduit is used to a single outlet as a sub-branch off the main rectangular duct on low pressure systems.

C.    The Employer shall have the option of using flexible hose at the mixing box in accordance with either of the following provisions:

(i).    A maximum of ten feet (10') of flexible hose may be    used to each inlet of the mixing box, or,

(ii).    (ii.)    A maximum length of ten feet (10') of flexible hose may be used as a connection to each outlet on the low pressure reducing device or mixing box.

# ARTICLE IV
## UNION SECURITY

**SECTION 1.** The Employer agrees to require membership in the Union as a condition of continued employment of all employees performing any of the work specified in Article I of this Agreement within seven (7) days following the beginning of such employment or the effective date of this Agreement, whichever is the later, provided the Employer has reasonable grounds for believing that membership is available to such employees on the same terms and conditions generally applicable to other members and that membership is not denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

**SECTION 2.** If during the term of this Agreement the Labor Management Relations Act of 1947, as amended, shall be amended by Congress in such manner as to reduce *the* time within which an employee may be required to acquire union membership, such reduced time limit shall become immediately effective instead of and without regard to the time limit specified in Section 1 of this Article.

SECTION 3. The geographic area and jurisdiction covered by this Agreement is composed of the five boroughs of New York City and Nassau and Suffolk counties, to be referred to as "the seven (7) counties of New York."

**SECTION** 4. Employees hired outside of the territorial jurisdiction of the Union to perform work outside of said jurisdiction and within the jurisdiction of another local union of the Sheet Metal Workers' International, Association shall be deemed to have complied with the provisions of this Article by acquiring and retaining membership in the said local union in whose jurisdiction such employee performs said work under the same conditions set forth in Section 1 of this Article.

**SECTION 5.** The provisions of this Article shall be deemed to be of no force and effect in any state, to the extent to which the making or enforcement of such provisions is contrary to law. In any state where the making or enforcement of such provision is lawful only after compliance with certain conditions precedent, this Article shall be deemed to take effect as to involved employees immediately upon compliance with such conditions.

**SECTION 6.** The Examining Board of Local Union No. 28 shall be the sole determining board to examine the qualifications for journeyperson membership into Local Union No. 28.

SECTION 7.
- A.  The Employer agrees to deduct from the wages of its employees, upon written authorization from the employees, two percent (2%) of the total wage and fringe benefit package plus organizing contribution of five cents ($ .05) for each hour paid ("assessment"). Assessment deductions shall be remitted weekly to the Financial Secretary of Local Union No. 28 together with a list of names of employees to whom said monies are to be credited. The Union shall have the right to withdraw manpower from the Employer, in addition to all other rights and remedies it might have, for failure to remit said monies weekly. Interest at the rate of two percent (2%) per month shall apply to all late payments of dues/assessments to the General Fund. Interest shall begin after a grace period which shall be the same length of time as that afforded by the Trustees of the Local Funds.
- B.  Dues and assessments are considered assets of the General Fund (Union) and title to all monies paid to and/or due and owing to the Union shall be vested in and remain exclusively in the Union. The Employer shall have no legal or equitable right, title or interest in or to any sum submitted by or due from the Employer.

## ARTICLE V MANPOWER

**SECTION 1.** The Union agrees to furnish the Employer, at all times, with duly qualified journeyperson sheet metal workers and registered apprentices in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement.

SECTION 2. The Employer shall file accurate weekly manpower requests with the Joint Manpower Committee established by the Union and the Employer.

SECTION 3. When the manpower requests filed with the Joint Manpower Committee show for two (2) consecutive weeks a need for one hundred (100) or more journeyperson sheet metal workers which has not been fulfilled, then the Union, within seven (7) days, shall take all additional steps necessary to meet the manpower requests of the Employer for qualified journeypersons, which may include having the industry work an eight (8) hour day at straight time.

SECTION 4. All Industry Promotion Funds are to share in paying one-half (1/2) of the total cost of administering the Hands-on-Journeyperson's Test.

SECTION 5. Contributions to the Welfare Fund and S.U.B. Plan on the first hour of overtime in the shop for key personnel only shall be on the basis of hours worked and not hours paid.

SECTION **6.** Whenever, in the opinion of the Union, unemployment has risen to the point where some corrective action shall be taken, the Joint Manpower Committee shall meet, within forty-eight (48) hours, to attempt to place unemployed sheet metal workers in jobs.

SECTION 7. A mandatory referral hall shall be established as follows:
- A. Required use of the referral hall will begin where there is unemployment of more than ten percent (10%) of active journeypersons available for work for three (3) consecutive months.
- B. Required use of the referral hall will end when there is unemployment of less than ten percent (10%) of active journeypersons available for work for three (3) consecutive months.
- C. For every four (4) new hires, one (1) must be from the referral hall.
- D. All members must put their name on the referral hall list within twenty-four (24) hours of termination.

SECTION 8. The Employer shall notify the Union of each mechanic hired and a letter of termination will be provided with the employee's final paycheck.

SECTION **9.** The Employer shall be at liberty to employ and discharge whomsoever it shall see fit, and the members of the Union shall be at liberty to work for whomsoever they shall see fit.

<div align="center">

**ARTICLE VI**
**APPRENTICES**

</div>

**SECTION 1.** All duly qualified apprentices shall be under the supervision and control of the Joint Apprenticeship Committee and Trust composed of ten (10) members, five (5) of whom shall be selected by the Employer, and five (5) by the Union. Said Joint Apprenticeship Committee shall formulate and make operative such rules and regulations as they may deem necessary and which do not conflict with specific terms of this Agreement, to govern eligibility registration, education, transfer, wages, hours and working conditions of duly qualified apprentices and the operation of an adequate apprentice system to

meet the needs and requirements of the trade. Said rules and regulations when formulated and adopted by the parties hereto shall be recognized as a part of this Agreement.

SECTION 2. The Joint Apprenticeship Committee and Trust designated herein shall serve for the life of this Agreement, except that vacancies in said Joint Apprenticeship Committee caused by resignation or otherwise may be filled by either party hereto, and it is hereby mutually agreed by both parties hereto that they will individually and collectively cooperate to the extent that duly qualified and registered apprentices shall be given every opportunity to secure proper technical and practical education, and experience in the trade under the supervision of the Joint Apprenticeship Committee and Trust.

SECTION 3.
    A.  Classes shall be instituted on a schedule established by the Joint Apprenticeship Committee and Trust. All appointments shall be made pursuant to and in accordance with the Agreement and Declaration of Trust, the Rules and Regulations adopted thereunder by the Trustees and as administered by the Joint Apprenticeship Committee and Trust.
    B.  Apprentices shall be charged tuition at a rate to be established by the Joint Apprenticeship Committee and Trust.
    C.  Apprentice ratio on layoff shall continue in accordance with past practices as determined by the Joint Apprenticeship Committee and Trust.

SECTION 4. Each registered apprentice after successfully completing a pre-apprenticeship of six (6) months shall serve an apprenticeship of four and one half (4 1/2) years. Such apprentices shall not be put in charge of work on any job, and shall work under the supervision of a journeyperson until their apprenticeship has been completed and they have qualified as journeypersons. The pre-apprenticeship program may be increased from six (6) months to one (1) year subject to the approval of the Court.

SECTION 5. All apprentices entering the program shall receive a wage package as set forth in the schedule attached hereto,

## SECTION 6.

A.   If the Union allocates any portion of wage increase for a journeyperson to fringes, then the apprentice fringes shall be increased by the amount of money allocated to the fringes times the percentage corresponding with the term.

B.   The Union shall allocate the total fringe amount among the various Funds and may allocate some wages to fringes.

C.   The wage rate for apprentices may be adjusted during the term of this Agreement so as to increase wages for entering apprentices and lower wages for upper-term apprentices with the total cost to the Employer remaining the same, upon the recommendation of the Joint Apprenticeship Committee and Trust and the approval of the Joint Adjustment Board.

D.   Changes in the apprentice wage package shall become effective at the same time as the journeyperson's increase.

E.   Each apprentice shall attend school for four (4) one-week sessions spread out over fifty (50) weeks. Each apprentice shall receive seven (7) hours pay, excluding benefits, for each eight (8) hour school day. This program shall be monitored and evaluated by the Joint

Apprenticeship Committee, who shall have the authority to make any changes it deems appropriate.

F.     The number and size of each apprentice class shall be determined by the Joint Apprenticeship Committee based upon the number of journeypersons employed.

G.     The Joint Apprenticeship Committee shall set up a procedure so that each apprentice shall have a basic set of tools when he/she reports to the Employer for work.

H.     The ratio of Journeyperson to Apprentice shall be 1:1 starting and 3:1 thereafter.

# ARTICLE VII
# WAGES

SECTION I. The hourly wage rate for journeyperson sheet metal workers covered by this Agreement when employed in a shop or on a job within the jurisdiction of the Union to perform any work specified in this Agreement is set forth in the schedule attached hereto.

SECTION 2. Wages at the established rate specified herein shall be paid in cash or by check, in the shop or on the job, at or before one-half ( ½ ) hour prior to quitting time on Friday of each week for all monies earned during the payroll week ending the previous Wednesday.

However, employees when discharged or laid off may be paid in full by cash or check for all days worked. Checks must be bonded or insured, and there shall be a one hundred dollar and no cents ($100.00) payment for any bounced check for any reason. In addition to the foregoing, in the event an Employer's check bounces for two (2) separate payroll periods, then the Employer must pay in cash for a period of six (6) months.

The Employer shall indicate on each check stub the amount for wages and the total assessments withheld from each member's weekly pay, the year-to-date total of wages, benefits, assessments, and the amount to be paid by the Union from such assessment payment to the court's affirmative action Education, Training, Employment and Recruitment Fund (ETER Fund).

## SECTION 3.
A. When a holiday falls on a Thursday, the Employer may terminate the work week on Tuesday, and in such case, wages at the established rates specified herein shall be paid in cash or by check, in the shop or on the job, at or before quitting time on Friday of that week. In such instance, any work performed on the Wednesday preceding the Thursday holiday shall be paid on the Friday of the following week.

B.    When a holiday falls on Friday, the Employer may likewise terminate the week on Tuesday, but in such case, wages at the established rate specified herein shall be paid in cash or check, in the shop or on the job, at or before quitting time on Thursday of that

week. In such instance, any work performed on the Wednesday and Thursday proceeding the Friday holiday shall be paid on the Friday of the following week.

C.   The wage rate for payroll weeks when wage increases occur shall be determined by whether the Monday of that payroll week is in the old month or the new month.

SECTION 4. Journeyperson and apprentice sheet metal workers who report to work at the direction of the Employer and are not placed to work or who are prevented from continuing to work for any reason, except for unforeseen conditions beyond the Employer's control (excluding snow, rain, and other conditions), shall be paid in the following manner:

A,  Journeyperson and apprentice sheet metal workers not placed to work shall receive two (2) hours of wages at the rate (straight time at overtime rate) then and there prevailing. If employed by a decking, siding or roofing contractor, journeyperson and apprentice sheet metal workers who qualify under this subsection shall also receive an additional two (2) hours pay from the S.U.B. Plan.

B.   Journeyperson and apprentice sheet metal workers who are placed to work but are prevented from continuing work in any hours from 7:30 a.m. to 11:30 a.m. shall receive four (4) hours of wages at the straight time rate then and there prevailing. Further, if the same should occur during such time(s) when the overtime rate is in effect, then the journeyperson and apprentice sheet metal worker shall receive wages at the overtime rate for the actual number of hours worked, but in no event said journeyperson or apprentice be paid for less than three and one-half (3 1/2) hours of work at the overtime rate.

C.   Journeypersons and apprentices who are placed to work after lunch who are prevented from continuing work shall receive seven (7) hours of wages at the straight time wage then and there prevailing. If the same should occur during such time(s) when the overtime rate is in effect, then the journeypersons and apprentices shall receive wages for the actual number of hours worked at the overtime rate then and there prevailing.

SECTION 5. When a journeyperson sheet metal worker or registered apprentice contracts for or engages for a lump sum to do any of the work covered by this Agreement, his/her membership card if a member of the Union shall be forfeited and surrender demanded by the Union subject to the provisions of the Constitution and Ritual of the Sheet Metal Workers' International Association.

SECTION 6.

A.   An Employer having been charged with violating this Article of the Agreement for paying to a journeyperson sheet metal worker less than the prescribed rate of wage shall, on notice, appear before a meeting of the Joint Adjustment Board called to consider the complaint and charges. If upon the submission of conclusive proof of said charges of violation, the Joint Adjustment Board shall find the Employer guilty an order shall be issued, without undue delay, that the Employer shall pay in cash to the journeyperson sheet metal worker involved the difference between the prescribed wage rate and that tendered by the Employer and accepted by the journeyperson sheet metal worker.

B.   A journeyperson sheet metal worker violating this Agreement by accepting less than the rate of wages prescribed in this Article of this Agreement shall without undue delay pay as liquidated damages into the Sick Dues Relief Fund of Local Union No. 28 the cash difference between the Agreement wage prescribed and that accepted by the journeyperson

sheet metal worker from the guilty Employer, and be subject to such discipline as provided in the Constitution and Ritual of the Sheet Metal Workers' International Association.

SECTION 7. On new all-air systems, the manufacturing of boxes shall be performed by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement at an eighty percent (80%) wage rate.

SECTION 8. An Employer wishing to layoff an employee must notify the Union office no later than 12:00 noon on the day of layoff, and the Union will maintain a numbered registry for this purpose. The employee is to be paid in full for hours worked and shall receive that pay no later than one-half (112) hour before the end of the same day, provided that the employee is on the job

site or in the shop. In the event of non-compliance, the Employer has the option to either pay the employee four (4) hours additional pay or retain the employee for the following work day. Employees when discharged or laid off may be paid in full by check for all days worked. In the event an employee is entitled to more than one week's pay, the Employer shall pay same with two (2) checks.

SECTION 9. The Union shall have the right to redistribute contribution amounts between the Funds upon sixty (60) days prior notice to the Employer.

Any proposed redistribution from the Funds to Wages, or from either Pension Fund to the other Funds or Wages, must receive prior approval by the Employer.

# ARTICLE VIII
## HOURS & HOLIDAYS

**SECTION** 1. The regular workday shall consist of eight(8) hours labor in the shop and seven (7) hours in the field. The starting time shall be between 6:30 a.m. and 8:00 a.m. at each Employer's discretion. The regular work week shall consist of five (5) consecutive eight (8) hour days labor in the shop or seven (7) hour days labor in the field, beginning with Monday and ending with Friday of each week. All full time or part time labor performed during the hours specified herein shall be recognized as regular time and paid for at the regular hourly rates specified in this Agreement. On job sites where more than one (1) sheet metal Employer is working, there shall be a uniform starting time, except as set forth below. The regular workday for journeypersons attending coordination meetings shall begin at the time the meeting starts.

SECTION. 2. Lunch time shall be one-half (1/12) hour between 11:30 a.m. and 12:30 p.m., except if hoisting is to be done between 11:30 a.m. and 12:30 p.m., then the lunch period may begin at 11:00 a.m.

SECTION 4. The following legal holidays shall be recognized and observed within the territory covered by this Agreement: New Year's Day, Martin Luther King, Jr., Day President's Day, Memorial Day, July 4th, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, the day after Thanksgiving Day and Christmas Day. Still further, the Union shall have the right/option to reschedule any of its designated eleven (11) holidays, prior to commencement of the calendar year, with input from the Employer.

SECTION 5. For all work permitted or required outside of the regular working hours specified in Section 1 of this Article one and one-half (1 1⁄2) times the regular rate shall be paid. On Sundays and the holidays specified in Section 4 of this Article, double the regular rate shall be paid.

SECTION 6. No overtime work shall be performed during the term of this Agreement except in proven emergency situations. The Shop Steward shall report to the office of the Union all requests of the Employer for overtime work and the names of the journeypersons and apprentices working overtime.

SECTION 7. Should a journeyperson sheet metal worker or a registered apprentice leave his work before it is completed without the consent of his Employer, it shall be on his own time and at his own expense.

SECTION S. High pressure fire dampers required pursuant to Local Law 5 may be installed outside of the regular work hours at a straight time rate with the proviso that a minimum of seven (7) hours work be performed during any one (1) regular work day.

SECTION 9. The Employer shall have the right to institute a time-management system in the shop. Such system may include Punch Card, Biometric, and Job Clock Keytab, etc.

**SECTION 10.** There may be a Saturday make-up day at straight time at the Employer's discretion with Union approval, which shall not be unreasonably withheld. This shall only apply to a situation where a work day is lost during the week due to reasons beyond the Employer's control; i.e. weather and job shutdown. There can only be one (1) Saturday make-up day regardless of how many days are lost during the week.

# ARTICLE IX SHIFT WORK

SECTION I. Shift work is defined as work that can only be performed outside the regular working hours as set forth in Article VIII, Section 1 of this Agreement. The Employer when confronted with this condition shall receive the approval of the Union, which approval shall not be unreasonably withheld.

SECTION 2. Should it be necessary to start a shift at the close of the regular work day, such shift, comprised only of journeypersons and apprentices who have not worked during regular working hours, shall start work between 3:30 p.m. and 11:30 p.m. with the customary lunch period, and shall be paid at ten percent (10%) above the established hourly rate. This shall be known as the first shift. The second shift shall be between 11:30 p.m. and 7:30 a.m., under the same conditions, with the exception of wages, which shall be paid at fifteen percent (15%) above the established hourly rate. On the above shifts, when job conditions require, the hours of work may be varied by mutual agreement of the parties. Shift work shall be for a minimum of five (5) consecutive work days in the shop or field.

SECTION 3. Employees working on shift on Saturdays shall be paid at one and one-half (1 1/2) time. Sundays and holidays shall be paid at double time shift differential (i.e. first shift twenty percent (20%), second shift thirty percent (30%). Shift wage rate shall be the basis for all contributions to the Funds.

SECTION 4. There shall be a lunch period during each shift conforming to the standard work day.

SECTION 5. Shifts shall start at 3:30 p.m. and 11:30 p.m. except if there is one (1) shift, which may start any time outside the regular working hours, provided the starting time remains the same for each day of the shift period.

SECTION 6. No shop shall be set up on the job site for shift work, and drafting shall not be done on shift work.

# ARTICLE X
# SHOP STEWARD

**SECTION** 1. The Shop Steward shall be appointed by the Business Manager and/or Business Agent.

SECTION **2.** The Shop Steward shall be a working steward and shall perform the duties of a journeyperson sheet metal worker, and shall report any violations of this Agreement to the Business Agent or to the office of the Union.

SECTION **3.** The Shop Steward shall not be discriminated against in any manner by the Employer because of his/her activities on behalf of the Union, or discharged for Union activity. Neither shall the Shop Steward be discharged or laid off for any reason prior to the Employer notifying the Business Agent seventy-two (72) hours prior to said proposed layoff or discharge. If the Business Agent disagrees with the discharge, then the Union may, within forty-eight (48) hours, refer the matter to the Joint Adjustment Board, and if not settled there, then the Union may continue its grievance according to the procedures set forth in Article XVI of this Agreement.

**SECTION 4.** Where four (4) or more journeyperson sheet metal workers, excluding superintendent or foreman, are employed on a job site, the Shop Steward may not be transferred without prior notification to the Business Agent.

SECTION **5.** When the Employer of a Shop Steward has six (6) or more journeyperson sheet metal workers working overtime on a job site, the Shop Steward shall be one of the journeypersons working overtime.

SECTION **6.**
   A. On Multi-Employer job sites (all working on parts of the same     contract), one (1) Shop Steward shall be selected by the Union from among journeypersons on said job. The Shop Steward's time with each Employer shall be a function of that Employer's portion of the work awarded on the job. All other provisions regarding Shop Stewards in this Agreement shall apply.

   B. The aforementioned provisions may be modified by agreement of the Employer and the Business Agent with the consent of the Union and the Associations.

SECTION 7. Every Employer must have a Steward in its shop to be selected by the Union from among the employees in the shop.

# ARTICLE XI
# TRAVEL

SECTION 1. When employed outside the limits of the seven (7) counties of New York, employees shall provide transportation for themselves which will assure their arrival at the job site at the regular starting time, and they shall remain at the job site until the conclusion of the regular time. The Employer shall reimburse the employee for all tolls, carfare or any other travel expenses incurred in going to or returning from the job site.

SECTION 2. There shall be no travel or board in the seven (7) counties of New York, and there shall be no travel or board within a fifty (50) mile radius of Columbus Circle, Manhattan.

SECTION 3. Fifty (50) miles or over from Columbus Circle, Manhattan, shall be a board zone and shall be paid for at forty-five dollars and no cents ($45.00) per day, seven (7) days per week. One trip is to be paid for at the start of the job and one trip is to be paid for at the completion of the job at a rate of forty cents ($ .40) per mile plus straight time traveling wage. When working outside the seven (7) counties of New York, the Employer shall reimburse its employees for tolls and car expenses incurred.

SECTION 4. On all work specified in Article I of this Agreement fabricated and/or assembled by employees within the jurisdiction of the Union or elsewhere for erection and/or installation within the jurisdiction of any other local Union affiliated with Sheet Metal Workers' International Association, whose established wage scale is higher than the hourly wage rates specified in this Agreement, the higher wage scale of the local Union in whose jurisdiction the work is to be erected andlor installed shall prevail and shall be paid by the Employer.

SECTION 5. Except as otherwise provided herein, the Employer agrees that journeyperson sheet metal workers hired outside of the territorial jurisdiction of the Union to perform or supervise work outside of said jurisdiction and within the jurisdiction of another local Union affiliated with Sheet Metal Workers' International Association shall receive the wage scale and working conditions of the local Union in whose jurisdiction such work is performed or supervised.

SECTION 6. When sent by the Employer to supervise or perform work specified in Article I of this Agreement outside of the jurisdiction of the Union and within the jurisdiction of another local Union affiliated with Sheet Metal Workers' International Association, journeyperson sheet metal workers covered by this Agreement shall be paid at least the established minimum wage scaled specified in this Agreement, but in no case less than the established wage scale of the local Union in whose jurisdiction they are employed plus all necessary transportation traveling time, board and expenses while employed in the jurisdiction of any other affiliated local Union, and said employees shall be governed by the established working rules of said Local Union. The provisions of this section shall also apply to all jobs located where no local Union of the Sheet Metal Workers' International Association has jurisdiction.

SECTION 7. Journeyperson sheet metal workers working for Employers in other jurisdictions shall work the regular working hours prevailing in that jurisdiction at the regular hourly rate as prescribed by this Agreement.

**SECTION 8.** The term "jurisdiction of the Union" as used in Article XI shall mean the five (5) boroughs of New York City, and Nassau/Suffolk Counties, Long Island, New York (referred to as the seven (7) counties of New York).

# ARTICLE XII
# FRINGE BENEFIT FUNDS

## A. LOCAL UNION NO.28 BENEFIT FUNDS

## SECTION 1. WELFARE FUND

A. The Employer shall pay to the Sheet Metal Workers' Local Union No. 28 Welfare Fund ("Welfare Fund") contributions as set forth in the schedule attached hereto. The contributions of the Employer shall be used to provide group insurance such as life, hospitalization, accident, including prepaid legal services, health and sick benefits and such other forms of group insurance as the said Welfare Fund may wish to provide in addition to administrative costs. The said Welfare Fund shall be administered pursuant to the Agreement and Declaration of Trust, as amended. The Welfare Fund shall provide/pay for an annual physical examination for all eligible participants.

B.  In addition, the Employer shall pay the amount set forth in the schedule attached hereto which shall be used exclusively to provide paid vacations for eligible employees.

C.  In addition, the Employer shall pay the amount set forth in the schedule attached hereto for each hour paid for all employees covered by this Agreement:

(i).    To provide weekly benefits as determined by the Trustees to unemployed journeyperson and apprentice sheet metal workers covered by this Agreement.

(ii).    To reimburse employees for time lost from work and/or expenses in obtaining an annual physical examination.

(iii).    To pay two (2) hours' wages to those employees who qualify under Article VII, Section 4 of this Agreement.

## SECTION 2. EDUCATION FUND

A.  The Employer shall pay the amount set forth in the schedule attached hereto to the Sheet Metal Workers' (Local Union No. 28) Education Trust Fund ("Education Fund") for each hour paid for all employees covered by this Agreement to provide for the establishment of standards and subsidies for the improvement of the proficiency, skill and ability of apprentice and journeyperson sheet metal workers, and further to provide for the education of such apprentices and journeyperson sheet metal workers now or hereafter members of the collective bargaining unit, and to provide such appropriate educational criteria and mechanical and scholastic attainments, greater skill and perfection in other and expanded fields to which such skills may be adapted and utilized all to the benefit of such apprentices and journeyperson sheet metal workers.

B.  If the Associations and the Union agree that additional funding is required for the Education Fund the parties shall contribute additional equal sums up to a total of three cents ($ .03) from the Union and three cents ($ .03) from the Employer.

## SECTION 3. ANNUITY FUND

The Employer shall pay the amount set forth in the schedule attached hereto to the Sheet Metal Workers' (Local Union No. 28) Annuity Fund ("Annuity Fund")for each hour paid for all employees covered by this Agreement Annuity Trust Fund ("Annuity Fund"), which shall be for the purpose of paying members of the Union termination benefits in the event of disability severance of employment or on any other basis prescribed by the Trustees and which will be on a vested basis under regulations established by the Trustees of said Fund.

## SECTION 4. SCHOLARSHIP FUND

The Employer shall pay the amount set forth in the schedule attached hereto to the Sheet Metal Workers' (Local Union No. 28) Joint Scholarship Fund ("Scholarship Fund") for each hour paid for all

employees covered by this Agreement. Scholarships are to be awarded under a competitive system, and under the regulations established by the Trustees of said Fund.

## SECTION 5. LABOR MANAGEMENT COMMITTEE
The Employer shall pay the amount set forth in the schedule attached hereto to the Joint Labor Management Committee and Trust ("JLM") for each hour paid for all employees covered by this Agreement. The contributions shall be for the purpose of protection and preservation of the work and jurisdiction covered in this Agreement.

## SECTION 6. LOCAL PENSION FUND
Commencing with the first payroll following the date hereof the Employer shall pay the amount set forth in the schedule attached hereto to the Sheet Metal Workers' (Local Union No. 28) Pension Fund for each hour paid for all employees covered by this Agreement.

The Agreement and Declaration of Trust establishing the Sheet Metal Workers' (Local Union No. 28) Pension Fund as amended and the Restatement of the Local Union No. 28 Pension Plan as amended from time to time are incorporated herein by reference and adopted by the Employer.

SECTION 7.
A. Each Employer shall furnish a surety bond to the Trustees of the several Local Union No. 28 fringe benefit funds and of any Local Union No. 28 jointly administered funds which may hereafter be established in order to secure the payments of contributions to said benefit funds provided for in this Agreement. Each Employer is required to furnish a bond in the amount of three thousand dollars ($3,000.00) per employee. In the event an Employer's manpower increases then said Employer shall be required to furnish a greater bond or cash deposit in accordance with the foregoing. The amount of manpower is to be determined by taking the highest number of sheet metal journeypersons and apprentices employed by the Employer for any three (3) consecutive months during the term of the Agreement.

B. A ventilation shop must furnish a minimum bond of twenty thousand dollars ($20,000.00); in the event an Employer becomes delinquent in its payment of contributions to the several Local Union No. 28 fringe benefit funds its minimum bond shall immediately be increased to forty thousand dollars ($40,000.00).

C. An Employer having a shop and/or address outside of the seven (7) counties of New York shall furnish a surety bond with the Trustees as to all contributions for hours paid on job sites within the seven (7) counties of New York in such amounts as set forth above or their cash equivalency. Coverage under said surety bond shall be limited to Local Union No. 28 Trust Funds.

**SECTION 8.** The Collective Bargaining Agreement shall become null and void with regard to any Employer who does not meet the bond and/or cash deposit requirements of the Collective Bargaining Agreement.

**SECTION 9.** The Employer shall be required to make payment at one and one-half (1 1/2) the regular hourly rate to all the respective Local Union No. 28 Funds and Plans on all overtime hours worked Monday through Saturday, and double the regular hourly rate for Sunday and holiday hours worked.

**SECTION 10.** An Employer may make payment of all fringe benefit contributions with a single check.

**SECTION 11.** All contributions to the Sheet Metal Workers' (Local Union No. 28) Funds and Plans shall be made weekly to be mailed on the same day wages shall be due.

**SECTION 12.** All contributions on apprentices shall be subject to further allocation and adjustment by the Union.

**SECTION 13.** All contribution hourly rates shall be rounded off to the nearest cent.

**SECTION 14.** All reasonable costs, fees and disbursements incurred in the collection of delinquencies shall be paid by the delinquent Employer.

**SECTION 15.** All delinquent contributions shall bear interest of two percent (2%) per month, twenty-four percent (24%) annually, excluding interest on arrears in reconciliation, which are ten percent (10%) or less. There shall be a five (5) day grace period before the interest shall commence to accrue. The Employer shall receive written notice of delinquency. Interest shall run from the end of the grace period. In addition to the foregoing, all delinquent Employers shall be charged with liquidated damages of twenty percent (20%) on the unpaid contributions.

**SECTION 16. Each** Employer shall submit a reconciliation report to the Local No. 28 Benefit Funds by the twentieth (20th) of the month following the month when covered employment was performed. Said reconciliation report form shall be furnished to the Employer by Local Union No. 28's Benefit Funds. Failure to file said report shall constitute a violation of the Employer's obligation under this Agreement and, among other available remedies, shall be subject to Section 15 above.

SECTION 17. The Union shall have the right to withdraw members from the Employer, in addition to all other rights and remedies of the Union and Trustees, after a thirty (30) day delinquency in the payment of weekly contributions, which can be non-consecutive, or the submission of monthly reconciliation reports, and the Union may exercise this right upon seventy-two (72) hours notice by mailgram, telegram, certified mail or facsimile transmission. The Union must withdraw members from the Employer after a six (6) week delinquency. The Union and the Funds shall have the right to bring an action in federal court pursuant to ERISA andlor to take other additional steps with regard to delinquent Employers as recommended by a joint management and labor committee.

**SECTION 18.** The books and records of the Employer shall be made available at reasonable times for inspection and audit by, but not limited to, the accountant, outside independent auditors or other representatives of the Trustees of any of Fringe Benefit Funds. The Employer shall be required to disclose upon such audits all payrolls and payroll ledgers, W-2 forms, quarterly federal payroll tax returns (Form 941), quarterly state payroll tax returns (Forms WRS-2 and WRS-30), annual federal and state tax returns, cash disbursement journals, purchase journals, New York State employment records, insurance company reports, Employer remittance reports, payroll and supporting checks, ledgers, vouchers, 1099 forms, and any other documentation concerning payment of fringe benefit contributions for hours worked by Employees remitted to multiemployer fringe benefit funds other than Fringe Benefit Funds described

herein, and any other items concerning payrolls. In addition, the aforementioned books and records of any affiliate, subsidiary, alter ego, joint venture or other related company of the Employer doing bargaining unit work within the Union jurisdiction, shall also be made available at all reasonable times for inspection and audits by, but not limited to, the accountants, outside independent auditors or other representatives of the Trustees of the Fringe Benefit Funds. The Employer agrees to pay the cost of the audit if the audit shows a discrepancy of ten percent (10%) or more when compared to the total contributions made during the audit period.

**SECTION 19.**
    A.  The Employer agrees to be bound by the provisions of the Collection Policy, By-Laws, and the Agreement and Declaration of Trust governing the various Trust Funds of Local Union No. 28 Benefit Funds, and the interpretations thereof by the respective Board of Trustees of the Funds as same may be amended from time to time, and hereby acknowledge that such trust documents are incorporated herein by reference and are adopted by the Employer.

    B.  Employer contributions are considered assets of the respective Funds and title to all monies paid into and/or due and owing said Funds shall be vested in and remain exclusively in the Trustees of the respective funds. The Employer shall have no legal or equitable right, title or interest in or to any sum paid by or due from the Employer.

**SECTION 20.** The Union shall have the option to create an additional Taft-Hartley fund that is permissible under federal law.

## B. NATIONAL BENEFIT FUNDS

**SECTION 21.**
    A.   The Employer shall pay the amount set forth in the schedule attached hereto to the Sheet Metal Workers' National Pension Fund ("Pension Fund"), for each hour paid or part of an hour for which an employee is covered by the Collective Bargaining Agreement between the Employer and the Union. Contributions are required for vacation time, sickness absences, and other hours for which payment is made to the employee.

    B.   Contributions shall be paid on behalf of an employee starting with the employee's first day of employment in a job classification covered by the Collective Bargaining Agreement.

    C.   The Agreement and Declaration of Trust establishing the Pension Fund is incorporated herein by reference, and thereby the Employer adopts the provisions of the Trust Agreement.

    D.   It is agreed that all contributions shall be made at such time and in such manner as the Trustees require. The Trustees shall have the authority to have their auditor or an independent Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions made to the Pension Fund. If the audit reveals that inaccurate contributions or insufficient contributions have been made, the Employer agrees to pay all accountants' fees incurred in making the audit

not to exceed the extent of its delinquency, and also all legal fees and costs incurred collecting the delinquency.

E.    If an Employer's workforce did not perform any covered employment within a particular month, a remittance report shall be filed on the twentieth day (20) of the following month indicating that no covered employment was performed. Failure to do so shall subject the Employer to liability for all fees and costs resulting from its failure to file such a report or one hundred dollars ($100.00), whichever **is** greater.

**SECTION 22.** The Employer shall pay the amount set forth in the schedule attached hereto to the National Stabilization Agreement For The Sheet Metal Industry ("SASMI Fund") for each hour paid for all employees covered by this Agreement. The contributions of the Employer shall be used to provide unemployment benefits in periods of reduced work opportunities which cause periods of unemployment.

**SECTION 23.,** The Employer shall pay the amount set forth in the schedule attached hereto for each hour paid for all employees covered by this Agreement to the International Training Institute ("ITI"), a fund which now encompasses the National Energy Management Institute ("NEMI") and the Sheet Metal Workers Occupational Health Institute and Trust ("SMOHIT").

**SECTION 24.**

A. The Employer agrees to be bound by the provisions of the Agreement and Declaration of Trust governing the various National Benefit Funds, and the interpretations thereof by the respective Board of Trustees of the Funds, as same may be amended from time to time, and hereby acknowledge that such trust documents are incorporated herein by reference and are adopted by the Employer.

**B.** Employer contributions are considered assets of the respective Funds and title to all monies paid into and/or due and owing said Funds shall be vested in and remain exclusively in the Trustees of the respective funds. The Employer shall have no legal or equitable right, title or interest in or to any sum paid by or due from the Employer.

**SECTION 25.** The Employer shall submit a remittance report and the required contributions to the NATIONAL BENEFIT FUNDS by the twentieth (20th) of the month following the month when covered employment was performed. Failure to file said report with the required contributions adopted hereinabove shall constitute a delinquency in violation of the Employer's obligations under this Agreement. The Trustees and/or Directors of the various National Benefit Funds may take whatever steps they deem necessary, including legal action, to collect such delinquent payments and provision of the Agreement notwithstanding.

If delinquent, the Employer agrees to pay the interest, liquidated damages, attorney's fees and costs as provided in the respective Trust Agreement.

**SECTION 26.** The Employer shall make available to the National Benefits Funds any and all records of the covered employees which any of such Funds may require in connection with its sound and efficient operation.

SECTION 27. The Employer shall be required to make payment at one and one-half (1 ½ ) times the regular hourly rate to the respective National Benefit Funds on all overtime hours worked Monday to Saturday and double the regular hourly rate for all hours worked on Sunday and holidays.

SECTION 28. If the Trustees of the National Pension Fund change their rules to allow a participating Local to change from the alternative schedule to the default schedule, then at that time either party may request that there be negotiations to discuss whether to change from the Alternative Plan to the Default Plan.

## ARTICLE XIII
## PROMOTION FUNDS

**SECTION 1.**
 A. The Employer shall contribute to the Sheet Metal Industry Promotion Funds created by the Trustees of the Sheet Metal Industry Promotion Fund of New York City and the Trustees of the Sheet Metal Industry Promotion Fund of Nassau and Suffolk Counties, the amount set forth in the schedule attached hereto,

multiplying the total number of hours paid to journeyperson and apprentice sheet metal workers. Reports shall accompany each remittance on forms as required by the Trustees of the Fund. Contributions by Employers shall be made weekly, mailed on the same day wages are due, and for the same period. All reasonable costs, fees and disbursements incurred in collection of delinquencies shall be paid by delinquent Employers. All delinquent contributions shall bear interest of two percent (2%) per month, excluding interest on arrears in reconciliation, which are ten percent (10%) or less. There shall be a five (5) day grace period before the interest shall commence to accrue. The Employer shall receive written notice of the delinquency.

**B.** The contribution rate per hour may be adjusted at the sole discretion of the Employer Associations.

SECTION **2.** The Industry Promotion Fund shall be used to promote the welfare of the sheet metal industry within the City of New York and Nassau and Suffolk Counties; and, more specifically, to make known the jurisdiction of the industry and to promote the programs of industry, education, training, administration of Collective Bargaining Agreements, and research and promotion of sheet metal products; to stabilize and improve Employer-Union relations; to promote, support and improve the training and employment opportunities of employees; and to disseminate to general contractors, architects, engineers and owners information about the kind, quality and merits of the work done by the industry; to make public the terms and conditions of this Agreement in order to avoid grievances and jurisdictional disputes; and to provide expanded opportunities for employment of journeyperson sheet metal workers.

**SECTION 3.** The Sheet Metal Industry Promotion Fund of New York City shall be administered by Trustees appointed solely by the Sheet Metal & Air Conditioning Contractors Association of New York City, Inc. The Sheet Metal Industry Promotion Fund of Nassau and Suffolk Counties shall be administered by Trustees appointed solely by SMACNA of Long Island, Inc. Representatives of the respective Industry Promotion Funds shall meet with representatives of the Union to establish liaison at least bimonthly. The Industry Promotion Fund of New York City shall be administered pursuant to the Declaration of Trust dated April 7, 1970, and any amendments thereto. The Industry Promotion Fund of Nassau and Suffolk Counties shall be administered pursuant to the Declaration of Trust dated October 1, 1969, and any amendments thereto.

**SECTION 4.** The Industry Promotion Fund of New York City shall provide up to the sum of fifty thousand dollars and no cents ($50,000.00) per year for the purpose of education and promotion of sheet metal informational material, as well as for securing and disseminating certain industry and project information to all Employers. The Union shall participate in the subject program as to the designation of personnel, allocation of funds and the formulation and administration of same.

SECTION **5.** There shall be established a program to provide paramedical training for a fixed number of journeypersons each year. This training shall take place outside of the regular work hours and the cost of the training program shall be paid by the Industry Promotion Fund of New York City.

# ARTICLE XIV
# WORK RULES

**SECTION 1.** Journeyperson sheet metal workers and registered apprentices covered by this Agreement shall provide for themselves all necessary hand tools.

SECTION 2. Journeyperson sheet metal workers and registered apprentices covered by this Agreement shall not be permitted or required as a condition of employment to furnish the use of an automobile or other conveyance to transport employees, tools, equipment or materials from shop to job, from job to job, or from job to shop; facilities for such transportation shall be provided by the Employer. This provision shall not restrict the use of an automobile or other conveyance to transport its owner and personal tools from home to shop or job at starting time or from job to home at quitting time.

SECTION 3. When employed in a shop or on a job within the limits of the seven (7) counties of New York, employees shall be governed by the regular working hours specified herein and shall provide for themselves necessary transportation within the said limits from home to shop or job at starting time and from shop or job to home at quitting time, and the Employer shall provide or pay for all necessary additional transportation during working hours.

**SECTION** 4. Employees shall be responsible for the transportation of their hand tools on their own time when being transferred from one job to another after completion of the work day.

**SECTION 5.** If an Employer receives a job or contract for installation and/ or fabrication of sheet metal work, then such job shall be fabricated and/or installed with plans drawn by journeyperson or apprentice sheet metal workers.

SECTION **6.** Drawings for all standardized items shall be used for fabrication by journeyperson sheet metal workers regardless of who has prepared such drawings.

SECTION 7. All drawings may be done in any scale except on drawings sent to the field which must be done in three-eighths inch (3/8") scale.

SECTION **8.** All duct drawings, background drawings, and revisions to drawings made by journeyperson sheet metal workers shall bear the names and I.A. numbers of the journeypersons making said drawings.

SECTION **9.** Any drawings, floor layouts, fan and/or pump or terminal units (air and water), fan data or outlet report forms that are required by the Employer for testing and balancing shall be prepared by sheet metal journeypersons or apprentices in the bargaining unit covered by this Agreement. Any existing plans, layouts or sepias furnished by the owner, architect, or engineer, or prepared by journeypersons or apprentices for other purposes, shall be used for testing and balancing. Any typing or duplicating may be done by office personnel. Any instrument or device and method of testing and balancing may be used if approved by the engineer or approving authority. The work shall be deemed complete when accepted by the engineer or approving authority.

**SECTION 10.** Within one hundred fifty (150) miles of New York City, any job that is sketched by Local Union No. 28 must be fabricated by Local Union No. 28.

SECTION 11. When a job is located within the seven (7) counties of New York and said job is a joint venture between an Employer located within the seven (7) counties of New York and an Employer located outside the seven (7) counties of New York, the sketching and fabricating of said job must be performed within the seven (7) counties.

SECTION 12. The amount of work that a member of the Union may perform shall not be restricted by the Union, nor by the representatives, officers or members of the Union; nor shall the use of machinery, tools, appliances or methods be restricted or interfered with. There shall be unrestricted use of ratchet wrenches if supplied by the Employer. It is understood and agreed that where such tools and equipment are used to perform work previously performed by journeyperson sheet metal workers and registered apprentices, such tools and equipment shall be operated by journeyperson sheet metal workers and registered apprentices.

**SECTION 13.** Duct lifts shall be limited in use as follows:

A. They shall be operated solely by sheet metal journeypersons and apprentices in the bargaining unit covered by this Agreement;

B. Duct lifts shall never be used as a scaffold for supporting employees;
C. All duct lifts shall be operated in accordance with the Manufacturers' Guidelines.
D. Duct lifts shall be limited in use to the erecting of 10-12 gauge metal smoke breechings, double-walled casings, double-walled ducts, all types of units and any other duct work not to exceed the length of twenty (20) linear feet being raised during any one lift;
E. Use of duct lifts will not be abused.

SECTION 14. Powder-actuated guns may be used only in accordance with the rules and regulations of the federal Occupational Safety and Health Administration, and only by persons who have first received appropriate training in the use and safety thereof.

**SECTION 15.** Any type of hoisting device may be used at the discretion of the Employer. The load per lift shall be limited to the load that can presently be lifted on a platform used for lifting dry wall sheets. Nets, containers, etc. must be loaded and unloaded by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement. Regular past practices of packaging and use of pallets and skids may be continued.

SECTION **16.** The Employer shall be required to accept an entire job, namely, the sketching, fabrication and installation, except under the following circumstances:
A. When the item it is being asked to fabricate is not normally fabricated by its customer;
B. When the Employer is a manufacturing company in signed agreement with Local Union No. 28.

SECTION 17. In accordance with existing or subsequently enacted federal, state or local law, and to ensure the demands of work preservation and job opportunities available to sheet metal workers, the Union shall have the right to withdraw manpower, upon fifteen (15) days' written notice, from an Employer on a job if the following items contained in Division 15 of the specifications are not provided in accordance with this Collective Bargaining Agreement: dampers, VAV's, air outlets, troffers, soundtraps, functional louvers, installation of duct reinforcements and seismic bracing.

SECTION **18.**
    A. Employers must report to the Union all jobs undertaken on the forms provided by the Union, which shall contain the following information: Description of work;
        Job name and location;
        General contractor;
        Mechanical contractor;
        Sheet metal contractor.

    B. Mandatory job reports are to be submitted to the Union and the respective Promotion Fund where the work is being performed by every Local Union 28 Draftsmen. The report among other items shall include therein testing and balancing contractors assigned to perform the work.

    C. Employers who do testing and balancing must submit Testing and Balancing Job Report Forms. The forms will be supplied to the Employer by the Union. The completed form is to be submitted to the office of the Joint Labor Management Committee and Trust.

**SECTION 19.** The Employer shall carry insurance or be self-insured to safeguard all employees against loss of tools and clothing in the shop or on the job site due to robbery or fire. The limit of the coverage for each loss shall be four hundred dollars ($400.00). Payment shall be made within two (2) weeks of submission of authenticated list.

**SECTION 20.** The Employer shall provide a suitable heated shanty on all jobs employing four (4) or more journeypersons and apprentices for twenty (20) days or more.

**SECTION 21.** The Employer is to have the company name and address permanently affixed on all trucks.

## SECTION 22.   COMPUTER

**A.** All computer terminals and/or work stations with machinery for the drawing, fabrication, erection, and testing, adjusting and balancing of any work formerly drawn, fabricated, erected and tested, adjusted and balanced by Local Union No. 28 sheet metal journeypersons and apprentices shall be operated by Local Union No. 28 sheet metal building trades journeypersons and apprentices.

**B.** All drawings (whether produced by hand or on computer) required for fabrication and erection of all work within the jurisdiction of the bargaining unit covered by this Agreement, as stated in Article I, Section 1, shall be done by Local Union No. 28 sheet metal building trades journeypersons and apprentices.

**C.** All work necessary for the completion of said drawings, including but not limited to architectural, structural, and mechanical backgrounds for duct work drawings, must be drawn (either by hand or on computer) by Local Union No. 28 sheet metal building trades journeypersons and apprentices.

**D.** No disk, tape or other transfer medium including but not limited to modems and scanners may be used to transfer all or any part of a drawing to the computer or computers of any Employer unless said disk, tape or other transfer medium has been produced by Local Union No. 28 sheet metal building trades journeypersons and apprentices. Employers may accept disks from others for the purpose of trade coordination only.

**E.** Architectural and structural backgrounds may be transferred on computer disks and utilized as backgrounds for duct work drawings.

**F.** There shall be no restrictions on the use of digitizers by sheet metal journeyperson and apprentice draftspersons.

**G.** Plotters and/or printers may be used to produce drawings and labels upon completion of work by sheet metal building trades journeypersons and apprentices. Plotters and/or printers shall be permitted to run without the presence of Union personnel.

**H.** During the duration of a job, a computer disk of duct work may be utilized only by Employers who are part of the bargaining unit.

**I.** All trade coordination (whether done by hand on a composite drawing or on computer) must be done by Local Union No. 28 sheet metal building trades journeypersons and apprentices.

**J.** The first person trained on computerized equipment shall be a journeyperson. Apprentices may be trained on said equipment under Joint Apprenticeship Committee guidelines. When an Employer conducts computer training for its draftspersons not receiving pay, then the Employer shall be obligated to offer said training to all of its drafting employees.

**K.** All computer burned or fabrication labels or bar-scan labels shall bear an identifying mark indicating the name of the shop fabricating the duct work. This shall apply only where a label is utilized, at the Employer's discretion, and is computer generated.

**L.** Architectural and structural backgrounds may be transferred on a computer disk and utilized for background drawings if the drawings are completed on CAD. Any required changes or modifications to the backgrounds will be made by Local Union No. 28 members except those changes provided on disk by the architect.

**M.** Any classification of a Local Union No. 28 worker may clean up the drawings received from architects and engineers. Said employee would remove extraneous information, change the font, and remove any unnecessary text. They are not permitted to do adjustments of the steel, wall locations, or to the reflecting ceiling plan.

**SECTION 23.** All testing, adjusting and balancing report forms and drawings made or marked up by a journeyperson sheet metal worker shall bear the name and I.A. number of the journeyperson sheet metal worker making said reports and marking up said drawings.

**SECTION 24.** Parties shall jointly establish a system for the submission of Letters of Assignment.

**SECTION 25.** Safe and healthy working conditions shall be observed at all times.

**SECTION 26.** At no time shall a swing or suspended scaffold crew be fewer than two (2) competent sheet metal workers.

**SECTION 27.** It is mutually agreed that all Municipal, State, and Federal Safety Standards will be observed at all times.

**SECTION 28.** Each Employer shall affix to the ductwork fabricated in its shop the name of the company, job identification, and, if fabricated for a "B" job, a "B" designation.

**SECTION 29.** Laser devices are not to be considered hand tools.

<div align="center">

ARTICLE XV
MARKET RECOVERY ADDENDUM

</div>

**Provide an addendum for all projects that have a sheet metal value of $100,000 or less for work performed in existing buildings. This does not apply to a job that is part of a larger project broken up by the construction manager or mechanical contractor.**

1. **The Office of Labor Management shall develop a list of those methods and materials that can be utilized to perform this work so as to allow the Employer to be competitive against non-union.**

2. **Unless the Employer fabricates its own duct work, the duct work must be purchased from a signatory Employer without any restrictions.**

3. **Dampers and louvers must continue to be purchased from a Local Union No. 28 Employer.**

4. **The wage package cost to the Employer for this work shall be reduced by twenty percent (20%) through a reduction or elimination of certain fringe benefit contributions as well as financial support from the Target Fund or Equality Fund.**

5. **This Addendum shall be administered by the Office of Labor Management for purposes of verification and implementation.**

6. **This does not apply to any project covered by a Project Labor Agreement or any Union agreement or understanding regarding the project.**

<div align="center">

ARTICLE XVI
**MISCELLANEOUS**

</div>

SECTION 1. If any Article or any Section of any Article, or any provision of any Section, or any combination of any provisions of this Agreement be rendered or declared illegal by reason of any existing or subsequently enacted federal, state or local law, or by a decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement, and all remaining provisions shall continue to be operating and binding on the parties hereto.

SECTION 2. A joint committee consisting of representatives of the Employers and the Union has been established for the following purposes:
   A.   To explore market retention, market recovery and market growth in the areas of residential work, light commercial and industrial work, public and utility work, energy management, energy retrofit, indoor air quality, system commissioning, and HVAC service work;

B.    To explore and promote the direct assignment/award of sheet metal work from the owner or general contractor to the sheet metal contractor;

C.    To discuss the problems of the roofing sheet metal industry with the authority to negotiate a separate addendum for these Employers;

D.    To establish a jointly-run safety committee.

E.    To develop a market recovery program under the Target Agreement, and to discuss provisions such as Resolution 78 which will allow the Employers to regain work lost to non-union contractors.

**SECTION 3.** When an Employer has a dispute with its customer and either a lien is filed or litigation commenced by said Employer, then the Union may withdraw journeypersons and apprentices from any other Employer seeking to work on that contract until such time as the Union determines that all wages and fringes have been paid by all parties involved.

**SECTION 4.** Any Employer not a member of the Sheet Metal & Air Conditioning Contractors Association of New York City, Inc., or SMACNA of Long Island, Inc. may receive the benefits and assume the obligations of this Agreement by and with the Union by signing an exact copy of this Agreement.

**SECTION 5.** The Union agrees that it will not enter into an Agreement with any Employer containing more favorable conditions than those agreed to in the current Agreement. Should it be shown that more favorable conditions prevail, then the more favorable conditions or wages shall apply to all signatories to this Agreement.

The foregoing provision shall not be applicable to Production, Manufacturing, Target, Airside, Equality, Resolution 78, Specialty and Roofing agreements wherein the Union is a signatory and/or party in interest. It is understood **that** any of said agreements shall be offered to the Employer for the work covered and described in said agreements. It is also understood that said Production and Manufacturing work shall be performed in separate quarters from any building trades construction work.

A signatory Employer must have a fully operational shop facility located in New York City or Long Island in order to be eligible to enter into a Collective Bargaining Agreement with the Union. This shall not apply to non-union contractors (shops) doing work in New York City and//or Long Island and organized after August 1, 2005.

**SECTION 6.** The Employer, upon written authorization from the employee, shall deduct from wages five cents ($ .05) per hour and remit same to the Local Union No. 28 Political Action League. The Union has a right to reallocate as it sees fit. Contributions to the Political Action League are not deductible for Federal Income Tax purposes.

SECTION 7. The Employer shall provide Statutory or State Disability coverage for its employees. If the rate of such coverage at any time during the term of the Agreement exceeds twice the current rate, then the employees will pay the cost beyond twice the current rate.

**SECTION 8.** The Employer and the Union mutually agree there shall be no discrimination against any member of the Union in connection with union activities, race, nationality, religion, gender, sexual orientation, age or marital status by any person in the employ of the Employer.

# ARTICLE XVII
## GRIEVANCE PROCEDURE

SECTION 1. Any and all complaints, disputes, claims, differences and/or grievances (except that delinquent contributions may also be resolved outside this procedure by bringing an action in federal court or through a motion for administrative expenses/proof of claim in bankruptcy court) arising out of or relating to the interpretation or application of the provisions of this Agreement shall be settled, adjusted and disposed of in the following manner:

A.   Between the Employer directly involved and the duly authorized representative of the Union.

B.   Between the Business Manager and the Association's official or representative.

C.   Grievances not settled in accordance with (A) or (B) above shall be referred to a Joint Adjustment Board consisting of five (5) representatives from the Sheet Metal & Air Conditioning Contractors Association of New York City, Inc., and SMACNA of Long Island, Inc., and five (5) representatives from the Union plus the respective attorney for each, whose decision shall be final and binding. Prior written notice of fourteen (14) days shall be required before a matter is referred to the Joint Adjustment Board. Any deadlocked Joint Adjustment Board that is not taken to arbitration within seven (7) working days shall be considered withdrawn.

D.   Grievances not resolved under procedure described in (C) above because of deadlock or otherwise shall be referred to arbitration as set forth in Section 2 of this Article XVI.

SECTION 2. Arbitration shall be had in accordance with the Labor Tribunal Rules of the American Arbitration Association. All cases shall be heard in chronological order within seven (7) calendar days from the date either party requests arbitration. Any group or series of cases related in substance or time may be submitted for arbitration to one Arbitrator at the same time.

SECTION 3. Parties shall share the cost of arbitration equally.

SECTION 4. Arbitrator's award shall be final, binding and conclusive upon the parties and employees for all purposes.

SECTION 5. The Arbitrator shall have full power and authority to determine all complaints, disputes, claims, differences and grievances in accordance with

the terms of the Collective Bargaining Agreement signed by the parties and to award such remedy or relief as is deemed reasonable and proper.

**SECTION 6.** There shall be an expedited hearing before the Arbitrator within three (3) working days of disagreement in connection with the proposed layoff, discharge or termination of a Shop Steward.

**SECTION 7.**
    A.    Upon the failure on the part of either party to comply with the Arbitrator's award the other party, after three *(3)* working days, shall be released from the "no strike-no lockout" provision, as the case may be.

    B.    Upon the failure of a party to comply with the award, the same Arbitrator who heard the original matter must meet within three (3) working days of a request to determine whether or not there has been compliance. If the Arbitrator finds non-compliance, he must make an award providing for liquidated damages in the sum of one thousand dollars ($1,000.00) per day commencing with the third working day following the issuance of the second award.

**SECTION 8.** It is agreed that funds collected by the Joint Adjustment Board as fines, awards, or other compensation, may be used by the Sheet Metal Workers' Local Union No. 28 Education Fund to fund educational projects upon recommendation to and approval of the Joint Adjustment Board.

**SECTION 9.** It is understood and agreed that in the event an Employer is unsuccessful in securing such work of a nature to be determined to be lower than No. 10 U.S. Gauge, such a matter should not be construed to alter, modify, amend, change or apply to any and all work historically traditionally and customarily performed by journeyperson and apprentice sheet metal workers in the collective bargaining unit in accordance with the Collective Bargaining Agreement.

**SECTION 10.** There shall be no strike or lockout at *any* time during the term of this Agreement except as provided for in Section 7 A.

# ARTICLE **XVIII**
## TERM

This Agreement and attachments hereto shall become effective as of the fifteenth day of September 2011, and remain in full force and effect until the thirty-first day of July, 2014, and shall continue in force from year to year thereafter unless written notice of reopening is given no fewer than ninety (90) days prior to the expiration date. In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party.



NOTE:

**FRESH AIR PLENUM**

BUILT UP SYSTEMS SHALL BE
SHOP FABRICATED METAL CASINGS

**RETURN AIR**



RETURN AIR PLENUM

AUTO DAMPER,

SYSTEMS 3 0 , 0 0 0 CFM AND OVER
MUST BE BUILT UP SYSTEMS

ALL

DAMPER

# IV SHEET METAL CASING



SHEET METAL SUPPLY AIR CASING

SKETCH

**B**

## SKETCH GOVERNING OBD'S AND SANTROLS
## BELOW HUNG CEILING





KENUIE.

'ERATED

SKETCH GOVERNING
O N ' S AND SANTROLS

REGISIU BACK



RET.
AIR

A D

RETURN AIR

SHAFT

SLOT LINEAR DIFFUSER

## SECTION THROUGH CEILING

SKETCH **O**

FINISHED FLOOR

SKETCH GOVERNING OBD'S AND SANTROLS ABOVE HUNG CEILING

C

| | |
|---|---|
| **SHEET METAL WORKERS**<br>**INTERNATIONAL**<br>**ASSOCIATION**<br>**LOCAL UNION NO.28** | **SHEET METAL & AIR CONDITIONING CONTRACTORS**<br>**ASSOCIATION OF**<br>**NEW YORK CITY, INC.** |

<div style="display: flex;">

**SHEET METAL WORKERS**
**INTERNATIONAL**
**ASSOCIATION**
**LOCAL UNION NO.28**

<u>**Negotiating Committee**</u>

</div>

**SHEET METAL & AIR CONDITIONING CONTRACTORS**
**ASSOCIATION OF**
**NEW YORK CITY, INC.**

<u>**Negotiating Committee**</u>

**Victor Gany**

**Dennis Appel**

**Ron Finamore**

**Brad Mattes**

**Frank Narciso**

**Ronald J. Palmerick**

**Peter Pappas, Jr.**

William Rothberg, Counsel

**SMACNA OF**
**LONG ISLAND, INC.**

<u>**Negotiating Committee**</u>